**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALPHA TELECOMMUNICATIONS, Inc., | ) | CASE NO.  1:06 CV 1110 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| vs. | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court upon the parties' cross-motions for summary judgment. **(ECF Nos. 8, 13).**  For the following reasons, the motion for summary judgment filed by Defendant International Business Machines Corporation ("IBM") **(ECF No. 13)** is **GRANTED** and Plaintiff's motion for summary judgment **(ECF No. 8)** is **DENIED.**

Plaintiff Alpha Telecommunications, Inc. ("Alpha") was a consulting firm that assists companies, including IBM, in obtaining federal grants for their client school districts to subsidize the purchase of technology ("E-Rate Program").  In early 2003, while Alpha and IBM were negotiating terms of E-Rate consulting services, they were also negotiating an agreement where Alpha would assist school districts in analyzing enrollment information to better track the number of students eligible for federally subsidized meals ("Free and Reduced Lunch" ("FRL")

Services).[1]  *ECF No. 13* at 6.  According to Alpha, on January 31, 2003, Phil Kibler, an IBM employee, sent a written request via e-mail to Nathaniel Hawthorne, one of Alpha's directors and shareholders who is representing Alpha in this case, requesting Alpha to confirm an agreement and fee for consulting services.  *ECF No. 8* at 5; *id.* Ex. C at 1.  On February 3, 2003, Hawthorne sent an e-mail to Kibler agreeing to provide the consulting services at the stated fee.  *ECF No. 8,* Ex. C at 2.  The February 3rd e-mail simply states "[c]onfirmed."  Based on this "confirmation" e-mail, Alpha contends that the parties entered into a valid contract.  *ECF No. 8* at 4.  Alpha alleges that IBM agreed to pay $75,000 per school district for the consulting work and claims that it has performed all requested work on 42 of IBM's accounts.  *Id*. at 3.  Alpha also alleges that IBM fraudulently induced Alpha to provide consulting services with no intent to pay Alpha for its work.  *Id*. at 4.

IBM's version of these events is different.  Phil Kibler alleges that in his prior dealings with Alpha, all agreements between the parties were evidenced by a formal, written contract.  *ECF No. 13* at 5; *id.* Ex. A ("Kibler Aff.") ¶ 6.  Alpha does not dispute this claim, but contends that the entire affidavit should be stricken because, by Kibler's own admission, some of his statements (though, according to Alpha, it is not clear which) are not based on his own personal knowledge.  *ECF No. 14* at 8; *see ECF No. 13*, Ex. A at 2.  According to IBM, the

---

[1] Alpha neither provides a detailed description of FRL services nor disputes IBM's characterization of Alpha's FRL services.  The description of these services and the fact that the parties were concurrently negotiating E-Rate services are therefore taken from IBM's motion for summary judgment.

It is unclear from IBM's briefs what benefit IBM obtained from the FRL Services. According to Alpha, the services gave IBM a competitive commercial advantage.  *ECF No. 11* at 2; *ECF No. 14* at 15.

parties never reached an agreement that IBM would pay for the FRL Services. Rather, Kibler sent an e-mail to Hawthorne on January 29, 2003, requesting a figure for the FRL Services and providing three options for dealing with the cost of the services. First, Alpha could charge the school districts directly. Second, Alpha could collect from the school districts through IBM. Third, the parties could absorb the cost without charging the school districts. *ECF No. 13* at 6; *id*. Ex. 1. Later that day, Hawthorne sent an e-mail to Kibler where he proposed to price the FRL Services at $75,000 per school district. *ECF No. 13* at 7; *ECF No. 1,* Ex. A at 4. On January 31, 2003, Kibler responded that the services would have to be priced "separately" by Alpha. *ECF No. 13* at 7; *id*. Ex. 2. On February 2, 2003, Kibler advised Hawthorne that the fees for the FRL Services would be "on Alpha" and Alpha would have pursue the fees from the school districts. *ECF No. 13* at 8; *id*. Ex. 3. When IBM did not receive an immediate response to this communication, Kibler left an urgent voicemail with Hawthorne and sent a second e-mail asking Hawthorne to confirm the fee structure. *ECF No. 13* at 9; *id.* Ex. 4. On February 3, Hawthorne replied to the second e-mail stating that he had already sent a concurrence to the suggested fee structure earlier that day. *ECF No. 13,* Ex. 5. According to IBM, the e-mail referenced in Hawthorne's response as already sent (the e-mail which, according to IBM, concurred with IBM's proposed fee structure) is the same e-mail Alpha relies on as proof of the existence of a valid contract. In other words, Alpha claims that the "confirmation" e-mail created a contract with IBM for a fee of $75,000 per school district, while IBM claims that the "confirmation" e-mail simply concurred with IBM's suggestion that Alpha would pursue the fees directly from the schools.

In April, 2006, IBM received an invoice from Alpha for $3,150,000 for work done on 42 of IBM's accounts. *ECF No. 1,* Ex. D. This is the first, and only, invoice Alpha ever sent to IBM with respect to the FRL Services. In May, 2006, Kibler sent an e-mail to Hawthorne in which he refused to make any payments on the grounds that the parties' discussions did not amount to a contractual agreement. *Id.* Ex. B. In May 2006, Alpha filed a Complaint against IBM, alleging claims for breach of an express contract, breach of an implied contract, and fraud. IBM filed a motion to dismiss the case on the grounds that Alpha, a company that was dissolved in 2005, lacked standing to pursue the action. *ECF No. 10.* Alpha filed a memorandum opposing the motion. *ECF No. 11.* Alpha also filed a motion for summary judgment, arguing that the exchange of e-mails created a binding contract between the parties. IBM filed an opposition to the summary judgment motion and a cross-motion for summary judgment, contending that Alpha lacks standing to pursue its claims and, in any event, IBM never agreed to pay for the FRL Services. Alpha filed an opposition to IBM's cross-motion for summary judgment. *ECF No. 14.* The parties agree that all relevant negotiations and discussions occurred via electronic mail, and that there is no other evidence, oral or written, bearing upon the issue of whether or not a contract existed between the parties for FRL Services.

**II.**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 403 (6th Cir. 1997).  If, after reviewing the record as a whole, a rational fact finder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law.  *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir.2001) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989)).  To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir.1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d at 1477).

If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury.  *Cox*, 53 F.3d at 148.  A scintilla of evidence in support of the nonmoving party's position is not enough.  *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  There must be evidence from which a reasonable jury could find for the nonmoving party.  *Id.*  If the evidence is insufficient to reasonably support a verdict in favor of the nonmoving party, the motion for summary judgment must be granted.  *Cox*, 53 F.3d at 150.

**III.**

IBM alleges that Alpha does not have standing to bring the instant action and Attorney Hawthorne is barred from representing Alpha.  In March, 2005, pursuant to Hawthorne's request, a state court judge ordered the dissolution of Alpha.  *ECF No. 6,* Ex. 1.  In October 2004, several months prior to the order of dissolution, the state court judge appointed a receiver to, among other things, collect Alpha's accounts receivable.  *ECF No.  6,* Ex. 2.  In November 2004, Attorney Hawthorne entered into a settlement agreement with several individuals including Paul Karas (Alpha's other shareholder and director).  *ECF No. 8,* Ex. A.  The settlement agreement states that  Hawthorne and the other defendants in that case "shall collect the accounts receivable from IBM."  *Id*. Ex. A ¶ 2.  At the same time, the settlement agreement states that Hawthorne and the other parties could no longer represent or hold themselves out as agents or representatives of Alpha as of November 24, 2004, the date of the agreement.  *Id*. Ex. A ¶ 4.  A subsequent provision states that Alpha's lawsuit against IBM (which, according to Hawthorne, references another lawsuit pending in the Sixth Circuit (*see ECF No. 11* at 4)) "shall be assigned to and prosecuted by . . . Hawthorne."  *ECF No. 8,* Ex. A ¶ 5.  This latter provision, however, appears to relate to a *pending* action.  In September 2005, six months after the state court ordered the dissolution of Alpha, the court terminated the receivership, thereby relieving the receiver of his responsibilities.  *ECF No. 11,* Ex. A.  In its order of termination, the state court acknowledged that Hawthorne and Karas reached an agreement whereby they assigned responsibilities among themselves for the assertion of claims and the collection of monies from certain entities.  *Id*. Ex. A. ¶ 4.  Based on this assignment, Hawthorne claims that Alpha has standing to pursue the instant action.  *See ECF No. 11* at 4, 9.

"[A] corporation continues to exist for the purpose of winding up its affairs even after it has filed a certificate of dissolution." *Kiraly v. Bonanno, Inc.,* No. 18250, 1997 WL 775685, at *2 (Ohio Ct. App. Oct. 29, 1997). "Any lawsuit maintained by the corporation must be for that purpose or based on an existing claim . . . ." *Bain Builders v. Huntington Nat'l Bank,* No. 78442, 2001 WL 777011, at *3 (Ohio Ct. App. July 5, 2001). In *Kiraly*, the Ohio Court of Appeals held that a breach of contract suit was not commenced for the sole purpose of winding up the affairs of a corporation where the dissolved corporation did not sue until three years after it dissolved. *Id.*; *see also Bain Builders,* at *3 (action for breach of a contract by a company whose articles of incorporation were cancelled (where the contract was executed while the company was validly incorporated) is not related to the winding up of the corporation's affairs).[2] Alpha contends that collecting on IBM's accounts is incident to winding up its affairs pursuant to the terms of the parties' settlement agreement, and pursuant to the state court's order authorizing Hawthorne and Karas to assert claims and collect payments due to the company. *ECF No. 11* at 9-10. Even if Attorney Hawthorne is entitled to collect accounts receivable pursuant to the settlement agreement, Alpha has no standing to pursue a claim that did not exist when the company was incorporated. Although Alpha argues that its claim arose on January 30, 2004, when the work was completed, *id.* at 3, 10, Alpha did not send IBM an invoice for work done on IBM's accounts until April, 2006, one year after the state court judge ordered a

---

[2]Both *Kiraly* and *Bain Builders* involved the interpretation of R.C. 1701.88, a statute governing corporations that have been voluntarily dissolved or whose articles of incorporation have been cancelled. Alpha was dissolved pursuant to R.C. 1701.91(A)(4) (judicial dissolution). However, Alpha specifically discusses the applicability of R.C. 1701.88 in its briefs (*see, e.g., ECF No. 14* at 12) and the Court finds that the case law cited in this Opinion is applicable to the instant case whether the corporation was judicially or voluntarily dissolved.

dissolution of Alpha, and two years after Alpha allegedly completed its work on IBM's accounts. It is Kibler's e-mail dated May 1, 2006 declining to pay the amount in Alpha's April, 2006, invoice that forms the basis of Alpha's breach of contract lawsuit.  Although Alpha contends that the invoice could not be sent until April 2006 because the payment of E-Rate grant funds lags behind the grant funding year, *see ECF No. 11* at 5; *id*. Ex. D ¶ 14, IBM persuasively responds that the FRL Services at issue in this dispute are unrelated to E-Rate funding, and, according to Alpha, required only a flat per-school fee.  *ECF No. 13* at 19.  Based on these facts, the Court finds that any claim for breach of contract did not exist until after the corporation dissolved, and any action for breach of contract is therefore not incident to the winding up of the corporation.

Even if Alpha had standing to bring this action, a rational fact-finder could not find that the parties entered into an enforceable contract.  IBM's February 2nd e-mail clearly expresses IBM's intention that Alpha would collect the expenses for FRL services from the school districts.[3] The e-mails that were exchanged prior to that date simply reflect the parties' negotiations and dealings on how to handle the costs of those services.  In fact, Kibler alleges that in his prior dealings with Alpha, all contracts between the parties were formalized in a written agreement.

Alpha argues that its February 3rd "confirmation" e-mail was sent in response to IBM's January 31st e-mail, not IBM's February 2nd e-mail.  *ECF No. 14* at 5.  On January 31, Kibler sent an e-mail asking Hawthorne to confirm some figures and stating that FRL services are priced "separately."  Alpha contends that the second e-mail sent by IBM requesting a

---

[3]The e-mail refers to a previous "note" that was sent from IBM to Alpha about the fees "being on Alpha and [Alpha] pursuing that with clients and charging for it separately."  The parties do not identify or provide this prior note.

concurrence on the fee structure actually requests a response to IBM's January 31st e-mail. *ECF No. 14* at 4. Therefore, argues Alpha, Hawthorne's February 3rd response (the "confirmation" e-mail) was sent to confirm the content of the January 31st correspondence.[4] *Id.* This argument is absurd, and in fact, illustrates that the parties had no meeting of the minds. *See Noroski v. Fallet,* 442 N.E.2d 1302, 1304 (Ohio 1982) (to constitute a valid contract there must be a meeting of the minds). Even assuming, *arguendo*, that the January 31st e-mail indicated IBM's intent to pay for the FRL Services, Alpha cannot ignore an intervening e-mail clarifying IBM's position that it would not pay for FRL Services. Alpha knew, or should have known, that IBM did not agree to pay for the FRL Services based on IBM's February 2nd e-mail. Alpha does not claim that it failed to receive the February 2nd e-mail. Rather, Alpha conveniently omits this e-mail from the Complaint and summary judgment motion and fails to mention the e-mail in any of its pleadings.

Alpha contends that another e-mail sent by Kibler in January, 2003, evidences IBM's intent to treat the costs of the consulting services as a marketing expense. *ECF No. 14* at 17-18. This e-mail states that IBM "eat[s] the cost" of services if the school districts do not obtain E-Rate funding. *ECF No. 14*, Ex. H at 2. This e-mail, however, does not imply that IBM would eat the cost of Alpha's FRL Services, especially after IBM disclaimed such responsibility.

---

[4]IBM alleges that the confirmation e-mail was sent at 12:36 p.m. *ECF No. 13* at 13. The time records that appear on the e-mails reflect that the confirmation e-mail was actually sent at 1:36 p.m. – five minutes *after* Alpha stated that a concurrence to the fee structure was already sent. This would imply that the confirmation e-mail was not the e-mail referenced by Alpha when Alpha advised IBM that it had already sent an e-mail concurring to IBM's proposed fee structure. In any event, whether IBM's error was intentional is irrelevant because Alpha also contends that the confirmation e-mail was sent at 12:36 p.m., before Alpha sent an e-mail notifying IBM that a concurrence was sent. *ECF No. 14* at 5.

The e-mails exchanged between the parties in 2003 do not evidence a meeting of the minds that IBM would pay for FRL Services. Even after viewing the facts in the light most favorable to Alpha, the Court finds that IBM did not promise to pay Alpha $75,000 per school for the FRL services, nor fraudulently induce Alpha into providing consulting services with no intent to pay.[5]

### IV.

Both because Alpha does not have standing to bring the instant action and because there is no genuine issue of material fact concerning the existence of a contract between Alpha and IBM, the motion for summary judgment filed by Defendant International Business Machines Corporation ("IBM") **(ECF No. 13)** is **GRANTED** and Plaintiff's motion for summary judgment **(ECF No. 8)** is **DENIED**. The above-captioned case is dismissed with prejudice. IBM's Motion to Dismiss **(ECF No. 10)** is **DENIED** as moot.

**IT IS SO ORDERED.**

*/s/ Dan Aaron Polster   August 24, 2006*
**Dan Aaron Polster**
**United States District Judge**

---

[5]IBM asserts that there is no evidence that Alpha ever provided the FRL Services. *ECF No. 13* at 10. The Court need not reach this issue.